# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2010-CA-00654-SCT

*THE ESTATE (THROUGH THE
ADMINISTRATRIX IDA CAMPBELL) AND THE
WRONGFUL DEATH AND SURVIVAL
BENEFICIARIES OF JOHN EARL SYKES,
DECEASED: IDA CAMPBELL, JEFFIE EZELL,
DONNIE DRAINE, SAMMIE JOE SYKES, RICKY
WAYNE SYKES, BRENDA FAY HARDWICK,
TERRY SYKES AND JAMES E. SYKES*

*v.*

*CALHOUN HEALTH SERVICES*

DATE OF JUDGMENT:              03/22/2010
TRIAL JUDGE:                  HON. ANDREW K. HOWORTH
COURT FROM WHICH APPEALED:    CALHOUN COUNTY CIRCUIT COURT
ATTORNEYS FOR APPELLANTS:     DAVID A. BOWLING
                              SUSANNAH C. MCKINNEY
ATTORNEY FOR APPELLEE:        JOHN G. WHEELER
NATURE OF THE CASE:           CIVIL - WRONGFUL DEATH
DISPOSITION:                  AFFIRMED - 07/21/2011
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**BEFORE DICKINSON, P.J., LAMAR AND KITCHENS, JJ.**

**DICKINSON, PRESIDING JUSTICE, FOR THE COURT:**

¶1.     After John Sykes died in the emergency room (ER) of Calhoun Health Services

(CHS), his estate sued the hospital for wrongful death, claiming Sykes should have been

hooked up to a cardiac monitor. The trial judge[1] held the estate had failed to prove that CHS

---

[1] CHS is a "community hospital" under Mississippi Code Section 41-13-15 (Rev. 2009). So
this case is governed by the Mississippi Tort Claims Act, which mandates that suits against
government entities be decided by a judge, sitting without a jury. Miss. Code Ann. § 11-46-13(1)
(Rev. 2002).

had deviated from the applicable standard of care, and had failed to prove that use of a cardiac monitor would have made a difference. We affirm.

## FACTS AND BACKGROUND

¶2.     CHS's triage policy – a process used to prioritize emergency-room care – requires a registered nurse to obtain information from emergency-room patients and categorize them as emergent, urgent, or nonurgent. The policy also provides that a nurse may "request assistance from [other] employees," but "[t]he nurse is responsible for determining the patient's acuity level."

¶3.     When Sykes arrived at CHS's emergency room on January 1, 2007, at approximately 5:50 p.m., he told the ER clerk he was experiencing "heart racing." The ER was unusually busy with multiple "emergent" patients who required the attention of the ER physician and two registered nurses on duty.

¶4.     Ten minutes after Sykes's arrival, Toby Lafayette, an emergency medical technician, took Sykes's vital signs, asked him questions about his chief complaint, and assessed him. According to Lafayette, Sykes said his chest was "sore," but denied that he felt pressure, radiating pain, or sharp or dull pain; he merely repeated that his chest was "sore." Sykes did not appear to be in distress, was not short of breath, and was not sweating; and he denied having any other symptoms.

¶5.     Lafayette relayed this information to his boss, Ron Evans, a paramedic, who instructed Lafayette to follow up with additional questions. After doing so, Lafayette wrote down the

2

"pertinent information" on a sticky note and gave it to one of the two ER nurses, Joan Marshall.

¶6. After receiving the information from Lafayette and learning about Sykes's chief complaint of "heart racing," Nurse Marshall determined that – because Sykes was not in distress, had "essentially stable" vital signs, and had complained only of chest "soreness" rather than "pain" – he was a nonurgent patient. Accordingly, Nurse Marshall did not initiate the hospital's Advanced Cardiac Life Support (ACLS) protocol, which would have involved the use of a cardiac monitor.

¶7. When Debbie Stroup Russell – also an ER nurse – arrived at 6:00 p.m. for her 7:00 p.m. shift, she found "a very hectic situation" in the ER. She went to reevaluate the four patients in the waiting room, asking whether any of them felt they needed to be seen immediately. One of the four – not Sykes – raised his hand. After caring for that patient, Nurse Russell assessed Sykes, who repeated his complaint of "chest soreness." Nurse Russell observed that Sykes was not short of breath or sweating, was not in distress, but was laughing and talking with the other patients in the waiting room. Based on her evaluation and observations, Nurse Russell also determined that Sykes was a nonurgent patient.

¶8. It is undisputed that some of the required triage information was obtained "piecemeal" from various CHS employees, and that Sykes did not receive a "target assessment of the chief complaint" from a registered nurse; nor did anyone ask him about his medications or medical history.

3

¶9.     At about 6:55 p.m., Nurse Russell heard a woman's scream in the waiting area. She immediately responded and saw a woman running out the door into the parking lot. When another person indicated that something was wrong with Sykes, Nurse Russell checked him and found him unconscious. She immediately called for help and began CPR. The ER doctor, another nurse, and some emergency medical services personnel responded, got Sykes onto a stretcher, and moved him to one of the patient rooms.

¶10.    Blood was drawn and Sykes was connected to a heart monitor, which revealed that he was in ventricular fibrillation. Attempts to resuscitate him using chest compressions, medication, and electronic defibrillation were unsuccessful, and Sykes was pronounced dead at 7:32 p.m. An autopsy revealed that Sykes had "severe cardiomegaly" (an enlarged heart) and had died of "sudden cardiac death" related to "severe . . . hypertensive heart disease."

¶11.    Sykes's estate sued CHS for wrongful death under the Mississippi Tort Claims Act, alleging that CHS's "inadequate assessment" had prevented it from recognizing and properly treating Sykes's cardiac event.

¶12.    After a bench trial in the Circuit Court of Calhoun County, the trial judge found that, despite CHS's failure to adhere to its own triage policy, the estate had failed to meet its burden of proving that CHS had deviated from the applicable standard of care. The judge also found that the nature of Sykes's complaints and his lack of observable symptoms did not require CHS to perform a more extensive evaluation or ACLS protocol; and that, even if Sykes had been attached to a cardiac monitor (as the estate argued he should have been),

4

there was insufficient evidence that any efforts at defibrillation would have saved Sykes's life. Accordingly, the trial court entered judgment for CHS, and Sykes's estate now appeals.

## ISSUES

¶13.   The estate raises five issues, which we condense and restate as follows:

I.    Was the trial court manifestly wrong in finding that the estate had failed to carry its burden of proving that CHS had breached the applicable standard of care?

II.   Was the trial court manifestly wrong in finding that, even if CHS had breached the standard of care, the estate did not carry its burden of proving that the breach was the proximate cause of Sykes's death?

## STANDARD OF REVIEW

¶14.   When reviewing a judgment from a bench trial, this Court employs the "substantial evidence/manifest error rule."[2] That is, the trial court's findings will be affirmed "unless they are manifestly wrong, clearly erroneous, or an erroneous legal standard was applied."[3]

## ANALYSIS

**I.    *The trial court was not manifestly wrong in finding that the estate had failed to carry its burden of proving that CHS had breached the applicable standard of care.***

¶15.   The trial court found that "[t]he plaintiffs in this case have failed to meet their burden of proving, by a preponderance of the evidence, that CHS health care personnel failed to conform to applicable standards of care in a manner that proximately caused or contributed

---

[2] ***Univ. of Miss. Med. Ctr. v. Pounders***, 970 So. 2d 141, 145 (Miss. 2007) (citing ***Miss. State Tax Comm'n v. Med. Devices***, 624 So. 2d 987, 989 (Miss. 1993); ***Kight v. Sheppard Bldg. Supply, Inc.***, 537 So. 2d 1355, 1358 (Miss. 1989)).

[3] ***City of Jackson v. Powell***, 917 So. 2d 59, 68 (Miss. 2005).

to the death of John Earl Sykes." The estate argues this finding was manifestly wrong and was not supported by "substantial evidence."

¶16. The estate bore the burden of proof at trial, and its argument that the trial court's verdict for the defendant was not supported by substantial evidence is misplaced. The defendant, CHS, had no obligation to put on any proof at all; and, unless the estate met its burden of proof, CHS was entitled to a verdict – not because of substantial evidence supporting the defense verdict, but because of insufficient evidence on behalf of the estate.

¶17. So whether the trial judge's verdict in favor of CHS was based on any evidence, substantial or otherwise, is not the question. Rather, the question is whether the estate met *its* burden of proof. And even when a plaintiff has produced enough evidence to establish a *prima facie* case of negligence, the credibility of the evidence still must be determined by the fact-finder. A defendant may – but is not required to – rebut the plaintiff's evidence.[4] So, to justify reversal, the estate must demonstrate that, upon considering the evidence favoring the plaintiff, the verdict was manifestly wrong. It has not done so here.

¶18. This Court has defined "standard of care" as follows:

> [G]iven the circumstances of each patient, each physician has a duty to use his or her knowledge and therewith treat through maximum reasonable medical recovery, each patient, with such reasonable diligence, skill, competence, and prudence as are practiced by minimally competent physicians in the same specialty or general field of practice throughout the United States, who have available to them the same general facilities, services, equipment and options.[5]

---

[4] *McCaffrey v. Puckett*, 784 So. 2d 197, 205-06 (Miss. 2001).

[5] *Palmer v. Biloxi Reg'l Med. Ctr., Inc.*, 564 So. 2d 1346, 1354–55 (Miss. 1990); *Hall v. Hilbun*, 466 So. 2d 856, 873 (Miss. 1985).

6

¶19. The breach of applicable standards of care in a medical-malpractice case generally must be established by expert testimony[6] that "identif[ies] the action or inaction [that] allegedly constituted a breach of duty and [that] proximately caused the patient's injury."[7]

¶20. The estate makes three arguments in support of its claim that the trial court was manifestly wrong in finding that the estate had not met its burden of proving that CHS's breach of the applicable standard of care proximately caused Sykes's death.

### A. The standard of care may take into account the conditions existing at the hospital at the time of the alleged negligence.

¶21. The estate argues that CHS's busy ER did not excuse its failure to initiate ACLS protocol because the standard of care is the same, regardless of the ER traffic at the time Sykes arrived. But the estate cites no authority for this proposition, and we find much authority to the contrary.

¶22. This Court has held that the minimum standard of care depends in part on "the circumstances of each patient," and is to be compared to minimally competent practitioners "who have available to them the same general facilities, services, equipment and options."[8] In considering the applicable standard of care, the trial judge properly considered the circumstances existing at the ER when Sykes arrived. And, as discussed in more detail in

---

[6] ***Drummond v. Buckley***, 627 So. 2d 264, 268 (Miss. 1993) (citing ***Kelley v. Frederic***, 573 So. 2d 1385, 1387 (Miss. 1990); ***Palmer v. Biloxi Reg'l Med. Ctr., Inc.***, 564 So. 2d 1346, 1355 (Miss. 1990); ***Phillips v. Hull***, 516 So. 2d 488, 491 (Miss. 1987)).

[7] ***Palmer***, 564 So. 2d at 1355 (citing ***Hull***, 516 So. 2d at 491; ***Hall*** 466 So. 2d at 870 -73).

[8] ***Palmer***, 564 So. 2d at 1354 - 55; ***Hall***, 466 So. 2d at 873.

the next subsection, CHS produced expert testimony from which the trial court reasonably could have concluded that CHS had satisfied the standard of care applicable to the circumstances existing at the time, so this argument is without merit.

**B.** **Experts disagreed over whether the standard of care required strict compliance with the CHS triage policy.**

¶23. Next, the estate argues that CHS's triage policy constituted the objective standard of care in this case. Dr. Andrew Perrin – an expert in the field of emergency medicine – testified that the standard of care required the administration of an electrocardiogram (EKG) within ten minutes of Sykes's arrival. The estate's other expert, Dr. Neil Shadoff, agreed. Finally, the estate argues that, "[a]ccording to the nurse who was supposed to be performing the triage, the standard of care require[d] compliance with the [CHS] policies and procedures."

¶24. CHS also called two expert witnesses, both of whom testified to the contrary. Dr. William Calhoun, an expert in cardiology, testified that CHS's assessment of Sykes was appropriate. Dr. Rick Carlton, CHS's emergency-medicine expert, testified that, under the circumstances at the time, the evaluation Sykes received "was a reasonable preliminary screen."

¶25. The estate points out that, on cross examination, Dr. Carlton admitted that a "targeted assessment" by a registered nurse is a "standard of practice," but not the "standard of care." But on redirect, Dr. Carlton unequivocally stated that, "given the totality of what was known at the time and the circumstances in the [ER,] they met the standard of care for Mr. Sykes."

8

¶26. As for Nurse Marshall's testimony, we first note that – although her opinion went into the record without objection – she was never qualified or offered as an expert by any party. The estate implies that, because Nurse Marshall worked at CHS, her testimony should be given greater weight than the testimony of the other experts. But the estate provides no citation of authority and no argument why this is so. We find that, even if Nurse Marshall's opinion testimony properly was in the record, that does not change the fact that the trial judge was free to accept the substantial evidence that CHS did not breach the standard of care.

¶27. Conflicting expert testimony – often called a "battle of the experts" – requires the fact-finder to assign credibility.[9] The trial judge, as the fact-finder in this case, was free to accept or reject any of the expert opinions. He found CHS's experts to be more credible, and we cannot say his decision amounted to an abuse of discretion. So this argument is without merit.

### C. Experts disagreed over whether Sykes's known symptoms required CHS to begin cardiac life-support protocols.

¶28. Finally, the estate argues that, even in the absence of proper triage, the symptoms known to the CHS nursing staff were sufficient to trigger CHS's duty to begin their ACLS protocol, which would have saved Sykes's life. But Dr. Calhoun testified that CHS's actions

---

[9] *Hill v. Mills*, 26 So. 3d 322, 330 (Miss. 2010) (citing *Bickham v. Grant*, 861 So. 2d 299, 307 (Miss. 2003)). *See also City of Jackson v. Brister*, 838 So. 2d 274, 279 (Miss. 2003) (citing *Yarbrough v. Camphor*, 645 So. 2d 867, 869 (Miss. 1994); *Bryan v. Holzer*, 589 So. 2d 648, 659 (Miss. 1991); *Bell v. Parker*, 563 So. 2d 594, 597 (Miss. 1990)) ("[W]hen the trial judge sits as the finder of fact, he has the sole authority for determining the credibility of witnesses.").

were appropriate, because none of Sykes's responses revealed symptoms that "sounded cardiovascular in nature."

¶29.    Dr. Carlton testified that, given Sykes's symptoms, it was reasonable under the circumstances for CHS to delay giving Sykes an EKG, which is a component of the ACLS protocol.  In sum, the trial court heard expert testimony that Sykes's symptoms were not typical cardiac presentation and that, due to the "mass casualty" situation, it was reasonable for CHS staff not to begin the ACLS protocol.  As discussed above, the trial judge resolved this battle of the experts in favor of CHS, so this argument is without merit.

¶30.    Overall, the estate has not established that the trial court was manifestly wrong to conclude that the estate did not prove a breach of the standard of care.  CHS's experts testified that the standard of care applicable to CHS required a "reasonable preliminary screen," and that Sykes received one.  Because the applicable standard of care may be based on the "circumstances of each patient" and the "general facilities, services, equipment and options" available to the hospital,[10] a reasonable fact-finder could conclude from the expert testimony that the standard of care for a hospital experiencing a "mass casualty" situation did not require a more detailed evaluation than the one Sykes received.

¶31.    Moreover, the trial court had heard sufficient testimony to conclude that CHS personnel did not have a duty to begin their ACLS protocol, because Sykes did not present

---

[10] *Palmer*, 564 So. 2d at 1354-55; *Hall*, 466 So. 2d at 873.

with typical symptoms of cardiac distress. The estate's entire argument on this issue constitutes an attempt to impermissibly reweigh the evidence.[11]

**II. The trial court was not manifestly wrong in finding that, even if CHS breached the standard of care, the estate did not carry its burden of proving that the breach was the proximate cause of Sykes's death.**

¶32. Proximate cause in medical-malpractice cases must be established through expert testimony.[12] The estate argues that it produced the required testimony, but that the trial court held it to an impermissibly high burden of proof, and was manifestly wrong in finding that it had not met its burden.

**A. The trial court did not apply an improper burden of proof.**

¶33. According to the estate, the trial court erroneously required it to *disprove* "all possible alternative theories to plaintiffs' proof of causation, and thus, [the trial court's] conclusion [was] not based on the proper standard of proof." In support, the estate points to the following conclusion of law penned by the trial judge:

> It is *entirely possible* that Mr. Sykes was not suffering a myocardial infarction at the time of his presentation to the CHS emergency department, given the autopsy findings of no acute or chronic infarction of heart muscle, and thus, his elevated cardiac isoenzymes were likely due to CPR and defibrillation efforts during his attempted resuscitation.[13]

---

[11] ***Quitman County. v. State***, 910 So. 2d 1032, 1045 (Miss. 2005) (The party appealing the verdict "cannot retry its case on appeal. . . .").

[12] ***McGee v. River Region Med. Ctr.***, 59 So. 3d 575, 578, (Miss. 2011) (citing ***McDonald v. Mem'l Hosp.***, 8 So. 3d 175, 180 (Miss. 2009); ***Barner v. Gorman***, 605 So. 2d 805, 809 (Miss. 1992)).

[13] (Emphasis added.)

¶34. We do not share the estate's assignment of importance to the phrase "entirely possible," as it was used in this context. The trial judge was free to observe that many things were possible, so long as his decision was based (as it was) on his finding that the estate had failed to establish its case by a preponderance of the evidence. This argument is without merit.

**B.    The trial court was not required to accept the estate's theory of causation.**

¶35. The estate also argues that – in the face of the evidence it presented – the trial court was in manifest error to find in favor of CHS on the issue of causation. But, as with the previous issue, this argument boils down to a battle of the experts, which the trial court resolved in favor of CHS.

¶36. The estate's theory, as elicited from Drs. Perrin and Shadoff, was that Sykes was in cardiac distress when he arrived at the CHS ER; that his condition deteriorated as he waited – unmonitored – in the waiting room; and that his fatal ventricular fibrillation was caused by a heart attack that could have been prevented had CHS properly screened Sykes and begun ACLS protocol shortly after he arrived. The estate's experts concluded that the elevated troponin levels in Sykes's blood established that he had suffered a heart attack.

¶37. On the other hand, CHS's theory was that Sykes's preexisting hypertensive heart disease, not a heart attack, caused his fatal ventricular fibrillation, and that even if CHS had done everything the estate's witnesses suggested it should have done, Sykes likely would have died anyway.

12

¶38. Dr. Calhoun explained the significance of Sykes's enlarged heart and opined that, if the elevated troponin levels really were caused by a heart attack, that would have shown up on the autopsy. Dr. Carlton agreed, adding that the elevated troponin levels probably were caused by the attempts to resuscitate Sykes. Dr. Carlton concluded his testimony by opining that, even if CHS had done everything the way the estate's experts testified it should have done, Sykes probably still would have died.

¶39. In short, both sides presented conflicting theories, each supported by ample expert testimony. Under such circumstances, it is the role of the fact-finder to resolve the conflict. In this case, the trial judge resolved the conflict in favor of CHS, and the estate offers no basis for its contention that the judge's resolution of this issue was manifestly wrong. As with the standard-of-care issue, the estate's argument is nothing more than an attempt to reargue its case. This issue is therefore without merit.

**C.    The trial court considered the proper causal time frame**.

¶40. The estate's final attempt to overturn the verdict is its argument that the trial court

committed clear error by only focusing on the chances of resuscitating the patient after he collapsed. It is the likely lost opportunity to save him during the hour plus period of time he was waiting for assessment and care before he became unresponsive which is the issue in this case.

¶41. While it is true that the trial court's findings of fact mentioned "the time of the disrhythmic event," there is no basis for the estate's assertion that the trial court didn't also consider Sykes's chance of recovery had CHS done everything the estate claims it should have – including earlier treatment. Indeed, Dr. Carlton – the last witness to testify – stated

13

that, when Sykes presented to the CHS emergency room, even if CHS had done all the estate claimed it should have, Sykes only had a "30 percent" chance of survival.

¶42.   This argument is without merit.

## CONCLUSION

¶43.   All of the estate's issues concern factual determinations that were within the discretion of the trial court.   The estate presents no meritorious argument that the trial court was manifestly wrong.   We affirm the judgment of the Circuit Court of Calhoun County.

¶44.   **AFFIRMED**.

**WALLER, C.J., CARLSON, P.J., RANDOLPH, LAMAR, KITCHENS, CHANDLER, PIERCE AND KING, JJ., CONCUR**.