# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2013-CA-00554-COA

ERNEST LANE, III, AND TRUSTMARK          APPELLANTS
NATIONAL BANK, CO-EXECUTORS OF THE
ESTATE OF JAMES OLDRUM SMITH, JR.

v.

RONALD D. LAMPKIN          APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 03/19/2013 |
| TRIAL JUDGE: | HON. GEORGE WARD |
| COURT FROM WHICH APPEALED: | WARREN COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANTS: | HARRIS H. BARNES III |
| | J. WILLIAMS JANOUSH |
| ATTORNEYS FOR APPELLEE: | DAVID W. MOCKBEE |
| | LANDMAN TELLER JR. |
| | DAVID WESLEY MOCKBEE |
| | COLEMAN MCCANN MOCKBEE |
| NATURE OF THE CASE: | CIVIL - OTHER |
| TRIAL COURT DISPOSITION: | AWARDED DAMAGES FOR BREACH OF FIDUCIARY DUTY AND USURPATION OF A CORPORATE OPPORTUNITY |
| DISPOSITION: | AFFIRMED - 09/16/2014 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE LEE, C.J., CARLTON AND MAXWELL, JJ.**

**CARLTON, J., FOR THE COURT:**

¶1.     This case addresses the valuation of a corporation and the related award of damages when one of the corporation's two shareholders dies and the remaining shareholder begins a new corporation to operate the same rock-supply business.  In the present case, Limestone Products Incorporated had only two shareholders, Ronnie Lampkin and J.O. Smith Jr.  Prior to Smith's death, Limestone operated for ten years with a line of credit personally guaranteed

by both shareholders. However, upon Smith's death, his estate (the Estate) refused Lampkin's request to extend a guarantee for Limestone's credit line beyond December 2006. Due to the Estate's refusal to extend the credit line, Limestone lacked the ability to operate and to meet its obligations beyond December 2006. In January 2007, Lampkin began a new corporation, Delta Stone, which conducted the same rock-supply operations previously provided by Limestone.

¶2. Giving rise to the instant appeal, Lampkin filed a complaint for a declaratory judgment against Ernest Lane III and Trustmark National Bank, as co-executors (the Executors) of the Estate. Lampkin requested that the Warren County Circuit Court declare the following: that he possessed the right to independently invest in and operate a rock-supply business; that he violated no corporate fiduciary duties to Limestone; that he possessed the right to continue to sell Limestone's existing inventory; and that he possessed the right to continue to collect Limestone's accounts receivable and apply them to the corporation's debts. The circuit court transferred the matter to chancery court. The chancellor found that Lampkin breached his fiduciary duty of loyalty by usurpation of a corporate opportunity when he started Delta Stone in January 2007, which operated the same rock-supply business and served the same function as Limestone.

¶3. After determining liability based on Lampkin's breach of his fiduciary duty of loyalty and his usurpation of a corporate opportunity, the chancellor then addressed and awarded damages for the offending conduct. In so doing, the chancellor determined that, even after establishing a new corporation and borrowing $400,000, Lampkin continued to fulfill a

2

contract initiated with Limestone and to ensure that the profits went to Limestone. The chancellor also determined that Lampkin credited Limestone with rock purchased or delivered to Limestone. After reviewing the evidence, including differing testimony from the parties' experts in business valuation, the chancellor awarded damages by considering Limestone's net value as of December 31, 2006, and December 31, 2007, less expenses, but with the added value of the remaining corporate assets, such as an aged front-end loader and a heating and air-conditioning unit.

¶4.     Upon appellate review, we find that the chancellor's analysis was supported by evidence in the record. In calculating the award of damages, the chancellor relied on expert opinions and financial reports to assess the corporation's net book value and its total net income for 2008 through 2012. The chancellor determined the corporation's total net book value to be $125,546.32. Based on the information provided, the chancellor also found Limestone's average net income to be $20,914, which amounted to a total net income of $104,570 for 2008 through 2012. However, on appeal, the Executors seek lost profits instead of lost income.

¶5.     In the court below, the Executors also sought attorneys' fees and expert-witness fees, but the chancellor denied the request for fees, finding that Lampkin acted without malice or gross negligence and did not commit fraud. The chancellor found that, even though Lampkin usurped a corporate opportunity, Lampkin believed Limestone could not operate without the line of credit. The chancellor also found credible Lampkin's testimony that the Estate refused to cooperate with guaranteeing the line of credit. The chancellor further found that

3

Lampkin acted in the interest of Limestone by completing the corporation's contracts and accounting for its profits and debts.

¶6. The Executors now appeal the judgment rendered by the Warren County Chancery Court in assessing damages owed to the Estate for Lampkin's breach of fiduciary duty and usurpation of a corporate opportunity. The Executors appeal the award of damages by raising the following issues: (1) whether the chancellor erred by admitting and relying on testimony from Lampkin's expert; (2) whether the chancellor properly assessed the amount of damages due to the corporation; and (3) whether the chancellor erred by refusing to award attorneys' fees and expert-witness fees. Finding no error in the chancellor's ruling, we affirm.

**FACTS**

¶7. In 1995, Lampkin and Smith formed Limestone, which they operated on land they jointly owned in Warren County. Lampkin and Smith each owned a one-half interest in the corporation, which bought and sold rocks. Lampkin also owned Lampkin Construction, which became one of Limestone's biggest customers.

¶8. For ten years, Limestone operated on a line of credit personally guaranteed by both Lampkin and Smith. The line of credit was set to expire in September 2006. In August 2006, Smith died, and his stock in the corporation and his interest in the real property transferred to the Estate. Prior to the expiration of Limestone's line of credit, Lampkin secured an extension until December 8, 2006, to provide the Estate with time to determine whether it would guarantee the loan. Between September 2006 and December 2006, the

4

parties discussed renewing the line of credit. However, the Estate failed to provide a guarantee before the deadline. Lampkin then formed a new corporation, Delta Stone, which began operating in January 2007. Delta Stone performed the same functions as Limestone, and through his new company, Lampkin completed Limestone's contracts and satisfied its debt obligations.

¶9. Lampkin filed a lawsuit against the Executors in Warren County Circuit Court. Lampkin asked the circuit court to find the following: (1) that Lampkin had the right to independently invest in and operate a rock-supply business; (2) that he was not in violation of his fiduciary duties as a director and officer of Limestone; (3) that he possessed the authority as an officer of Limestone to continue to sell the corporation's existing inventory, collect accounts receivable, and apply the monies received to the corporation's debt; and (4) that he should receive compensation for his actions and should be paid interest on any monetary advances made on the corporation's behalf. The Executors filed a counterclaim against Lampkin for present and future profits the corporation lost due to Lampkin's actions and for attorneys' fees. Lane, one of the co-executors, also filed a motion to transfer the matter to Warren County Chancery Court.

¶10. The circuit court judge entered an order finding the matter to be proper for a declaratory judgment. Further finding that the chancery court possessed proper jurisdiction over the subject matter of the declaratory-judgment action, the circuit court judge granted the motion to transfer the matter to chancery court. In an order entered by the Warren County Chancery Court, all the chancellors recused themselves from the case, and the Mississippi

5

Supreme Court appointed a special judge to preside over the proceedings. Several of Smith's beneficiaries filed a motion to intervene in the lawsuit, which the specially appointed judge granted.

¶11. Lampkin filed a motion for separate trials on the issues of liability and damages. He also asked the chancellor to stay discovery on damages pending the outcome on the trial as to liability. The chancellor granted Lampkin's motion and bifurcated the trial. The chancellor held a hearing on the issue of liability in November 2009. The main issue before the chancery court was whether Lampkin breached his fiduciary duty to Limestone by usurping a corporate opportunity when he started Delta Stone. In determining whether Lampkin breached his fiduciary duty to Limestone, the chancellor considered the following: (1) whether the business opportunity was "reasonably related to the existing or prospective business activities of the corporation"; and (2) whether the corporation had the financial ability to seize the opportunity. *See Aqua-Culture Tech. Ltd. v. Holly*, 677 So. 2d 171, 183 (Miss. 1996) (Mississippi courts apply a two-part test to determine whether a party has established a prima facie case of conflict of interest arising from a business opportunity in question being a corporate opportunity).

¶12. In his order, the chancellor noted Lampkin's concession that the business ventures and activities of Delta Stone and Limestone were the same. The chancellor further noted that Delta Stone operated on the same property as Limestone, used the same facilities and equipment as Limestone, and sold rock to the same customers as Limestone. In determining whether Limestone had the financial ability to seize the corporate opportunity, the chancellor

6

noted that "[t]here is no dispute amongst the parties that the bank would not renew the line of credit without the personal guarantees of both the Estate and Lampkin." The chancellor continued:

> From a review of the documentary evidence, and from listening to the testimony of the parties and their experts, the [c]ourt is not convinced that Limestone could function without the need for the line of credit. However, the [c]ourt is also not convinced that the Estate was given ample information or time to decide whether [it] wanted to renew the line of credit.

¶13.    In reaching a determination as to Lampkin's liability, the chancellor considered the events that occurred between Smith's death in August 2006 and the December 2006 deadline for renewing the line of credit. Within his discussion of these events, the chancellor provided a summary of the correspondence exchanged by the parties. After reviewing the evidence, the chancellor found that Lampkin failed to timely provide financial information to the Estate and to give the Estate ample time to review Limestone's corporate records. As noted in the chancellor's order, the Estate requested this information to decide whether to provide a guarantee for Limestone's line of credit, and without the requested information, the Estate was unable to make an informed decision prior to the line of credit's expiration.

¶14.    The chancellor stated that, if the line of credit was crucial to operating Limestone, then Lampkin, who was aware of the upcoming deadline, possessed a fiduciary duty to Limestone to cooperate with the Estate to meet the deadline. The chancellor found that Lampkin's failure to timely provide the necessary financial information to the Estate prevented him from prevailing in his argument that the Estate's failure to renew the line of credit relieved him of any further fiduciary duty to Limestone. According to the chancellor,

7

"[t]he Estate should have been provided more time to make the determination [of whether to guarantee the line of credit], even if that meant allowing the line to mature and letting the line sit for a few more weeks or months while Limestone's documents were inspected."

¶15. Although Limestone's balance sheets showed the corporation to be solvent, the chancellor noted that the corporation apparently lacked "a substantial amount of equity with which to continue on with the business." The chancellor found that the line of credit had been Limestone's primary source of funds with which to purchase inventory for the past ten years. He therefore agreed with Lampkin that, without the guaranteed line of credit, Limestone could not continue to operate. The chancellor found that Lampkin was an officer and director of Limestone and thus owed a fiduciary duty to the corporation. By forming Delta Stone, Lampkin breached his fiduciary duty to Limestone. In addition, the chancellor found that Lampkin's failure to timely provide the Estate with the requested financial information hindered Limestone's financial ability to continue its business operations. As a result, the chancellor granted the Executors' motion to dismiss and denied Lampkin's request for declaratory relief.

¶16. Following the chancellor's ruling that Lampkin breached his fiduciary duty to Limestone by starting Delta Stone and usurping a corporate opportunity, the parties presented evidence as to the damage that resulted from Lampkin's breach of duty. Both parties hired an expert to testify as to the valuation of Limestone. Lampkin hired Brent Saunders, and the Executors hired James Koerber. The chancellor accepted both experts as certified public accountants and experts in the field of business valuation.

8

¶17. After considering both experts' testimony, as well as the testimony provided by Lane and Lampkin, the chancellor entered his findings of fact. The chancellor stated that any damages owed by Lampkin should be paid to Limestone rather than to individual shareholders. As part of his analysis, the chancellor considered the profits Lampkin made because of the usurpation; Limestone's assets; both Limestone's and Delta Stone's income and profit; and the debts and other expenses associated with the operation of both Limestone and Delta Stone. The experts' testimony varied greatly as to the proper valuation for Limestone, and the chancellor found that the experts were "just splitting hairs" and getting "bogged down" in an argument over the proper terminology to describe Limestone's valuation. The chancellor stated, "Whether you call it asset based or net book value or lost profits, this [c]ourt is merely concerned with how and when to value this business."

¶18. With regard to damages, the Executors claimed that the Estate was entitled to one-half of the lease payments owed to Limestone since 2007. While the chancellor found that the lease was still in effect, he also noted Lampkin's testimony that no lease payments had been made in five years. In addition, the chancellor found that, as the only two shareholders of Limestone, Lampkin and Smith were equally responsible for any lease payments and equally entitled to one-half of any lease proceeds. He therefore found that the issue "create[d] a wash."

¶19. The chancellor next considered testimony by Koerber, the Executors' expert, that 649,203 tons of rock purchased by Limestone was diverted from the corporation's accounting system and remained unreported. The chancellor found that Lampkin and his expert,

9

Saunders, accounted for this allegedly unreported rock in their testimony. As to this issue, the chancellor stated the following:

> The [c]ourt does not find merit in the argument of the Estate and its expert as it relates to "unreported rock." The business was a closely held business where rock was delivered to different locations and was billed on occasion to Lampkin himself. Saunders and Lampkin were able to readily account for the alleged unreported rock. Therefore, the [c]ourt will not take into consideration any purported "unreported product." The [c]ourt does not find that this constitutes "lost profits" of the businesses.

¶20. The chancellor next looked at the actual profit of Limestone and Delta Stone as reported in the companies' financial records. He found the following:

> There is no question, from the testimony of the parties, of the inability of the parties to get along, and therefore, the Estate and Lampkin would not have continued to do business together for a prolonged period of time [after Smith's death]. If the [c]ourt were to carry its business assessment forward to the year 2012, based on the financial records of both companies, the [c]ourt would merely be placing a net loss in the hands of the corporation. A corporation is responsible for not only the profits of a business, but also the liabilities. . . . [T]here is no doubt from the financial records of the business that Limestone . . . relied heavily on an operating line of credit and was never all that profitable. It is the opinion of the [c]ourt that an award of damages after 2007 would be more equitable were the [c]ourt to look to past performance of Limestone . . . . Taking into consideration the value of the business as of December 31, 2007, the [c]ourt agrees with the findings made by Saunders in "Exhibit L" to his expert report. In this exhibit[,] Saunders takes the value of the year[-]end net book values for 2006 and 2007 and backs out all expenses, all erroneously placed personal expenses of Lampkin[,] as well as accounts receivable from the partners. After deductions, Saunders added the value of the corporation's remaining assets . . . . He arrived at a total net book value of $125,546.32.

¶21. In determining Limestone's lost profits since January 1, 2008, the chancellor found

"historical lost net profits" to be an appropriate method for assessing damages.[1] The chancellor began his analysis with Koerber's average-net-income figure of $20,914 for the years 2000 through 2007. The chancellor then multiplied this amount by five, which accounted for each year in the disputed period from 2008 through 2012. This calculation amounted to a total net income of $104,570 for 2008 through 2012. Adding the sum of these historical costs to the net book value of $125,546.32 provided by Saunders, the chancellor concluded that the total damages owed to Limestone amounted to $230,116.32. The chancellor also ordered that the Estate, as one of Limestone's two shareholders, would receive $115,058.16, which amounted to half of the total damages awarded to Limestone.

¶22.    After determining the damages owed to Limestone, the chancellor next considered the Executors' claim for attorneys' fees and expert-witness fees. Although Lampkin usurped a corporate opportunity, the chancellor found that the parties and their attorneys had repeatedly corresponded in the several months after Smith's death and prior to the expiration of the line of credit. Therefore, the chancellor found that the Estate was well aware of Limestone's situation. The chancellor also noted Lampkin's belief that Limestone could not continue to operate without the line of credit, as well as Lampkin's efforts in completing Limestone's contracts and keeping the profits from Limestone separate from Delta Stone's profits. Based on the evidence presented, the chancellor found that Lampkin's actions failed to show malice

---

[1] The chancellor cited to *Lovett v. E.L. Garner Inc.*, 511 So. 2d 1346, 1353 (Miss. 1987), for his finding that this method is acceptable in Mississippi cases involving breach of contract.

11

or gross negligence or that he committed fraud. The chancellor therefore denied the request for attorneys' fees. Aggrieved by the chancellor's judgment, the Executors now appeal to this Court.

## STANDARD OF REVIEW

¶23. When supported by substantial evidence, a chancellor's findings of fact will not be disturbed on appeal unless the chancellor abused his discretion, was manifestly wrong, was clearly erroneous, or applied an erroneous legal standard. *Biglane v. Under the Hill Corp.*, 949 So. 2d 9, 13-14 (¶17) (Miss. 2007). As the reviewing court, we examine the entire record and accept as true all "evidence which supports or reasonably tends to support the findings of fact made below, together with all reasonable inferences which may be drawn therefrom and which favor the lower court's findings of fact. That there may be other evidence to the contrary is irrelevant." *Par Indus. Inc. v. Target Container Co.*, 708 So. 2d 44, 47 (¶4) (Miss. 1998) (citation and internal quotation marks omitted). As to questions of law, however, we apply a de novo standard of review. *Id.* at (¶5).

## DISCUSSION

I. **Whether the chancellor erred by admitting and relying on testimony from Lampkin's expert.**

¶24. The Executors contend that the chancellor erred by relying on testimony from Lampkin's expert, Saunders. In addressing this assignment of error, we recognize that "the admission of expert testimony is within the sound discretion of the trial judge." *Miss. Transp. Comm'n v. McLemore*, 863 So. 2d 31, 34 (¶4) (Miss. 2003) (citation omitted).

12

"Therefore, the decision of a trial judge will stand unless we conclude that the discretion was arbitrary and clearly erroneous, amounting to an abuse of discretion." *Id.* (citation and quotation marks omitted). In support of their argument, the Executors assert that Saunders's testimony was unreliable because his damage calculation was based on unreliable accounting methods and he possessed a conflict of interest.

¶25. The Executors first contend that Saunders erroneously used a business-valuation analysis to calculate damages owed to Limestone when he should have used a lost-profits analysis. The Executors further "contend that the inappropriate analysis utilized by [Saunders] should, at the very least, necessitate deference to the damages determined by [their] expert[, Koerber,] and, at most, render the testimony of [Saunders] unreliable according to Rule 702 of the Mississippi Rules of Evidence." The Executors also argue, without providing any supporting caselaw, that Saunders's testimony was unreliable due to a conflict of interest that compromised his objectivity. As reflected in the record, Saunders's firm performed tax work for Lampkin personally and for Lampkin's businesses, including Limestone and Delta Stone.

¶26. "Conflicting expert testimony—often called a 'battle of the experts'—requires the fact-finder to assign credibility. The trial judge, as the fact-finder in this case, was free to accept or reject any of the expert opinions." *Estate of Sykes ex rel. Campbell v. Calhoun Health Servs.*, 66 So. 3d 129, 135 (¶27) (Miss. 2011) (citations omitted). Our law clearly provides that expert testimony should only be admitted if it meets the requirements of Rule 702. *Bailey Lumber & Supply Co. v. Robinson*, 98 So. 3d 986, 991 (¶13) (Miss. 2012).

13

¶27.    Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

¶28.    Thus, pursuant to Rule 702, expert testimony must satisfy a two-pronged inquiry:  (1) "the witness must be qualified by virtue of his . . . knowledge, skill, experience[,] or education"; and (2) "the witness's scientific, technical[,] or other specialized knowledge must assist the trier of fact in understanding or deciding a fact in issue."  *McLemore*, 863 So. 2d at 35 (¶7) (internal citations omitted).  "In other words, the expert witness must be qualified to render the opinion, and the testimony must be relevant and reliable."  *Bailey Lumber*, 98 So. 3d at 992 (¶13) (citation omitted).

¶29.    Saunders testified that he obtained his certified-public-accountant license in 1977.  He further testified that he began his own accounting firm in 1981 and that his practice had included performing business valuations since the mid-1980s.  Saunders also testified that he was a member of several professional associations and was certified in financial forensics by the American Institute of Certified Public Accountants.  In addition, Saunders stated that he had previously testified and been accepted as an expert in all types of accounting-related areas, including business valuations, lost-profits calculations, corporate accounting practices and procedures, and damage studies.

¶30.    During both Saunders's voir dire and cross-examination, the Executors questioned

14

him about his objectivity and his firm's work on behalf of Lampkin and Lampkin's businesses. The Executors specifically asked Saunders during voir dire whether he could have Lampkin as a client and still retain his independence as an expert witness in the proceeding. In response, Saunders stated:

> There's the standard . . . which forensic accountants fall under which is in the consulting practice. And as a general rule, independence is not a requirement to practice in that area. And specifically[,] I can do tax work and accounting work for a client and still be independent under those rules as an expert witness.

When asked during voir dire whether he worried that, if he testified adversely to Lampkin, he might lose Lampkin's business, Saunders replied, "Absolutely not."

¶31. As the record reflects, Lampkin laid a foundation and presented Saunders as an expert witness in business valuation, and the Executors then had an opportunity to conduct voir dire. As the fact-finder in the court below, the chancellor was in the best position to assign credibility to the conflicting expert testimony presented during the "battle of the experts," and he was free to accept or reject any of the expert opinions. *See Campbell*, 66 So. 3d at 135 (¶27). Based on the record before him, the chancellor accepted Saunders as an expert in the field of business valuation and allowed him to testify. The chancellor clearly found that Saunders was qualified to render an expert opinion and that his testimony was relevant and reliable. *See Bailey Lumber*, 98 So. 3d at 992 (¶13). After reviewing the record and applicable caselaw, we find no abuse of discretion by the chancellor's decision to admit and rely on Saunders's expert testimony. This issue therefore lacks merit.

**II.      Whether the chancellor properly assessed the amount of damages**

15

**due to the corporation.**

¶32. Throughout their brief, the Executors argue that the chancellor failed to properly assess the damages owed to not only Limestone but also the Estate. The Executors seek lost profits instead of lost income as damages. In reviewing this assignment of error, we acknowledge the following:

> The assessment of damages is a finding of fact, and the appellate court reviews an award of damages under the clearly erroneous standard. This Court has stated that damage awards are only overturned when the trial judge has abused his discretion or in exceptional cases where such awards are so gross as to be contrary to right reason. The appellate court must review the damages award by looking to the facts of each case.

*Greater Canton Ford Mercury Inc. v. Lane*, 997 So. 2d 198, 206 (¶30) (Miss. 2008) (internal citations and quotation marks omitted). In support of their argument that the chancellor awarded Limestone inadequate damages, the Executors raise the following sub-arguments: (1) the chancellor based his calculation of damages on unreliable accounting methods; (2) the chancellor failed to take into account the unreported rock that Lampkin allegedly diverted from Limestone; and (3) the chancellor failed to award damages with respect to a valid lease agreement.

### a. The Chancellor's Accounting Methods

¶33. In response to the Executors' claim that the chancellor based his damages assessment on unreliable accounting methods, Lampkin asserts that the chancellor relied on portions of both experts' calculations that fell within accepted methodologies to arrive at a reasonable calculation based on the parties' evidence. Lampkin further asserts that the chancellor was

16

within his discretion to "make his own calculation using an approved methodology, in this case[,] using past profits to calculate lost profits."

¶34. In calculating the amount of damages owed to Limestone, the chancellor cited *Lovett v. E.L. Garner Inc.*, 511 So. 2d 1346, 1353 (Miss. 1987), for his finding that "historical lost net profits" is an acceptable method to use in cases involving breach of contract. With regard to loss of future profits, *Lovett* states the following:

> In Mississippi, one may recover for loss of future profits in a breach of contract action as long as such profits are proved with reasonable certainty, not based on speculation or conjecture. In calculating loss of future profits, such loss is that of net profits as opposed to gross profits. To ascertain net profits, a party must deduct such items as overhead, depreciation, taxes and inflation. Further, future profits should always be discounted at an appropriate rate to arrive at present value. And, finally, the plaintiff must mitigate damages if he is able to do so.
>
> There are no guidelines set in stone specifying the degree of certainty that we require of parties in proving loss of future profits. Indeed, the degree of proof required usually depends on the particular facts of the case. ***One guideline frequently recognized by this Court is a party's proof of its past profits.***

*Id.* (emphasis added and internal citations omitted).

¶35. Thus, as recognized by Mississippi caselaw, "one way to show damages (the loss of future profits) is to introduce evidence of past profits." *Sanders v. Dantzler*, 375 So. 2d 774, 777 (Miss. 1979). This Court has further clarified, however, that "[i]t is lost profits and not lost income which is the proper measure of damages, i.e., it is a net and not a gross figure on which damages should be calculated." *Lynn v. Soterra Inc.*, 802 So. 2d 162, 171 (¶33) (Miss. Ct. App. 2001) (citing *City of New Albany v. Barkley*, 510 So. 2d 805, 807 (Miss. 1987)).

17

¶36. As reflected by the record in this case, the chancellor looked at Limestone's past performance for the years 2000 through 2007 to assess damages in the form of lost future profits for the years 2008 through 2012. In determining lost future profits, the chancellor used the average net income provided by Koerber, the Executors' expert. For 2000 through 2007, Koerber determined that the average net income, or past profits, for Limestone amounted to $20,914. Multiplying this amount by five, the number of years for 2008 through 2012, the chancellor determined that Limestone's loss of future profits totaled $104,570. The chancellor also used the net book value of $125,546.32 provided by Saunders's testimony and added this amount to the calculation of Limestone's lost future profits. As a result of this method, the chancellor determined that Limestone suffered damages of $230,116.32.[2]

¶37. Based on applicable caselaw and the facts of this case, we find no abuse of discretion in the methods the chancellor used to assess Limestone's damages. In reviewing the particular facts of this case, we find that the record fails to demonstrate that this is one of those "exceptional cases where [the award was] so gross as to be contrary to right reason." *Greater Canton Ford Mercury*, 997 So. 2d at 206 (¶30). Accordingly, this argument lacks merit.

   b.  **The Unreported Rock**

---

[2] To calculate damages, the chancellor used the net book value of $125,546.32, plus the lost profits calculated for 2008 through 2012, as follows:

  $125,546.32
+ $104,570.00
  $230,116.32

18

¶38. The Executors also contend that the damages calculated with respect to lost profits are greatly understated because the chancellor failed to take into account unreported rock that Lampkin allegedly diverted from Limestone. Without providing any caselaw to support their argument, the Executors claim that the chancellor abused his discretion by eliminating the unreported rock from the calculation of Limestone's lost profits.

¶39. In his findings of fact, the chancellor discussed the parties' conflicting testimony regarding the allegations of unreported rock. The chancellor then dismissed the Executors' allegations, stating that "Lampkin and Saunders both provided testimony which accounted for the whereabouts of the alleged unreported rock." As our caselaw recognizes, "[c]onflicting testimony in the record is to be resolved by the trier of fact." *Scott Addison Constr. Inc. v. Lauderdale Cnty. Sch. Sys.*, 789 So. 2d 771, 773 (¶8) (Miss. 2001). The chancellor, as the fact-finder in the court below, possessed the authority and discretion to weigh the credibility of the parties' testimony. *Univ. Med. Ctr. v. Martin*, 994 So. 2d 740, 746-47 (¶25) (Miss. 2008).

¶40. As reflected in his judgment, the chancellor clearly resolved this factual dispute regarding the allegations of unreported rock in Lampkin's favor. As previously acknowledged, on appeal this Court examines the entire record and accepts as true all "evidence which supports or reasonably tends to support the findings of fact made below, together with all reasonable inferences which may be drawn therefrom and which favor the lower court's findings of fact." *Par Indus. Inc.*, 708 So. 2d at 47 (¶4) (citation and internal quotation marks omitted). Based on the applicable standard of review, we find no abuse of

19

discretion in the chancellor's resolution of this factual dispute in Lampkin's favor.  This

argument also lacks merit.

### c.    The Lease-Agreement Payments

¶41.    The Executors further assert that the chancellor failed to award damages based on a

valid lease agreement.  According to the Executors' argument, the chancellor erroneously

found that lease monies were owed to Limestone by Lampkin and Smith, the shareholders.

They instead contend the following:

> Limestone is the lessee, or tenant; therefore, Limestone is responsible for
> paying monies to Lampkin and . . . Smith under the lease.  These lease
> payments are the obligation of Limestone, not [the obligation of] the individual
> shareholders.
>
> . . . .
>
> By not finding damages for the [Estate] due to Lampkin's failure to pay the
> rent owed from Limestone to himself and Smith, the [chancellor] essentially
> pierced the corporate veil.  Oddly enough, the [chancellor] pierced the
> corporate veil to the detriment of the non-breaching party, which is contrary
> to the applicable caselaw.

The Executors therefore argue that the chancellor ignored the corporate form of Limestone,

the entity responsible for the lease payments, and instead pierced the corporate veil against

the non-breaching party without any reason.

¶42.    In response, Lampkin first asserts that the chancellor properly declined to award

damages for lease payments that the Executors claim Lampkin owed.  If this Court decides

to consider the claim for lease payments, however, Lampkin argues that the Executors failed

to raise the claim in their pleadings.  According to Lampkin's brief, the claim was not raised

20

until trial in July 2012. Thus, Lampkin argues that any claim as to lease payments before 2009 is time-barred by the three-year statute of limitations.

¶43. Lampkin also asserts that the Estate lost any ownership interest in the property leased by Limestone once the November 2011 judgment was entered to partition the property. He therefore argues that, at most, only lease payments allegedly owed from 2009 through 2011 could be considered. Overall, however, Lampkin asks this Court to affirm the chancellor's determination that the Estate suffered no damages from the failure to pay rent and that the facts make this issue "a wash."

¶44. Applying the appropriate standard of review to the facts of this case, we find no abuse of discretion by the chancellor's decision to not include any alleged lease payments in his calculation of the damages owed to Limestone. We therefore find that this argument lacks merit. As a result, we find no merit to the Executors' overall argument that the chancellor failed to properly assess damages owed to Limestone and the Estate.

### III. Whether the chancellor erred by refusing to award attorneys' fees and expert-witness fees.

¶45. In their final assignment of error, the Executors contend that the chancellor erred by denying their request for attorneys' fees and expert-witness fees. This Court reviews the grant or denial of attorneys' fees and expert-witness fees for abuse of discretion. *See Smith v. Dorsey*, 599 So. 2d 529, 550 (Miss. 1992) (finding no abuse of discretion in the chancellor's award of expert's fee and attorneys' fees).

¶46. Rule 54(d) of the Mississippi Rules of Civil Procedure discusses judgments and costs.

21

The comment for Rule 54 states the following:

Three related concepts should be distinguished in considering Rule 54(d): These are costs, fees, and expenses. Costs refers to those charges that one party has incurred and is permitted to have reimbursed by his opponent as part of the judgment in the action. Although costs has an everyday meaning synonymous with expenses, taxable costs under Rule 54(d) is more limited and represents those official expenses, such as court fees, that a court will assess against a litigant. Costs almost always amount to less than a successful litigant's total expenses in connection with a law suit and their recovery is nearly always awarded to the successful party. . . .

Fees are those amounts paid to the court or one of its officers for particular charges that generally are delineated by statute. Most commonly these include such items as filing fees, clerk's and sheriff's charges, and witnesses' fees. In most instances an award of costs will include reimbursement for the fees paid by the party in whose favor the cost award is made.

Expenses include all the expenditures actually made by a litigant in connection with the action. Both fees and costs are expenses but by no means constitute all of them. Absent a special statute or rule, or an exceptional exercise of judicial discretion, such items as attorney's fees, travel expenditures, and investigatory expenses will not qualify either as statutory fees or reimbursable costs. These expenses must be borne by the litigants.

¶47. "As a general rule, fees for expert witnesses, beyond the ordinary fees authorized for witnesses, are not taxable as costs unless there is a statute specifically allowing such an expense." *Hubbard v. Delta Sanitation of Miss.*, 64 So. 3d 547, 564 (¶70) (Miss. Ct. App. 2011) (citation and internal quotation marks omitted). While certain Mississippi statutes[3] provide for expert-witness fees to be taxed as costs in particular cases, we can find no such

---

[3] For example, see Mississippi Code Annotated section 95-5-10(3) (Rev. 2013), which provides that "[a]ll reasonable expert[-]witness fees and attorney's fees shall be assessed as court costs in the discretion of the court" in trespass-to-timber cases.

statute that applies to the present case.

¶48. As to the issue of an award of attorneys' fees, Mississippi caselaw provides the following:

> [T]his Court has analogized an allowance of attorneys' fees to the grant of punitive damages. Absent statutory authority or contractual provisions, attorneys' fees cannot be awarded unless punitive damages are also proper. Within these guidelines, the allowance and the amount of a fee is a matter committed to the sound discretion of the trial judge.

*Smith*, 599 So. 2d at 550 (internal citations omitted).

¶49. The supreme court has previously held:

> [P]unitive damages are recoverable in breach[-]of[-]contract cases where the breach results from an intentional wrong and when there has been a showing of malice or gross/reckless disregard for the rights of others. Punitive damages are only appropriate in the most egregious cases so as to discourage similar conduct and should only be awarded in cases where the actions are extreme.

*Warren v. Derivaux*, 996 So. 2d 729, 738 (¶28) (Miss. 2008) (internal citations omitted).

¶50. Based on the evidence presented by the parties, the chancellor found that Lampkin's conduct failed to show malice, gross negligence, or that Lampkin committed fraud. The chancellor further found that Lampkin usurped a corporate opportunity from Limestone but that the Estate was well aware of Limestone's developing situation. In his order, the chancellor noted Lampkin's testimony that Limestone could not continue operating without the line of credit, as well as Lampkin's efforts to complete Limestone's contracts and to separate Delta Stone's profits from Limestone's profits. As a result of his findings, the chancellor concluded that Lampkin's actions "could be said to be somewhat negligent, but not grossly negligent. The [c]ourt does not believe [Lampkin's] behavior was egregious or

23

committed with malice, and the Estate has not alleged any fraud."

¶51. A review of the record shows that the chancellor's findings of fact were supported by substantial evidence. Therefore, applying our appropriate standard of review and accepting as true all "evidence which supports or reasonably tends to support the findings of fact made below, together with all reasonable inferences which may drawn therefrom and which favor the lower court's findings of fact[,]" we find no abuse of discretion by the chancellor's refusal to award attorneys' fees and expert-witness fees. *Par Indus. Inc.*, 708 So. 2d at 47 (¶4) (citation and internal quotation marks omitted). This assignment of error lacks merit.

¶52. **THE JUDGMENT OF THE WARREN COUNTY CHANCERY COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANTS.**

**LEE, C.J., IRVING, P.J., ROBERTS AND MAXWELL, JJ., CONCUR. GRIFFIS, P.J., DISSENTS IN PART WITH SEPARATE WRITTEN OPINION, JOINED BY BARNES, ISHEE AND FAIR, JJ. JAMES, J., NOT PARTICIPATING.**

**GRIFFIS, P.J., DISSENTING IN PART:**

¶53. I respectfully dissent.

¶54. The chancellor called the judgment appealed a "Judgment on Valuation of Business." The chancellor recognized that Lampkin and Smith incorporated Limestone Products, Inc. The chancellor ruled:

> The liability portion of the case was heard first and the Court determined Lampkin breached his fiduciary duty to the Smith estate by usurping a corporate opportunity through the starting of Delta Stone. In addition to the business itself, Limestone Products, the parties jointly owned certain real property on which the business was being operated. The real property has been partitioned by this Court. All that remains is an assessment of damages as a result of the above referenced usurpation.

24

The chancellor then concluded, without citation to authority, that "[t]he damages portion of the trial took place on the above referenced days. This portion of the trial *consisted primarily of establishing a valuation for Limestone Products.*" (Emphasis added). The chancellor then discussed the opinions offered by the expert witnesses. The chancellor then stated the "Court's Findings":

> A director or officer who is found to have usurped a corporate opportunity "may be held accountable for the fruits of the wrongdoing." 19 C.J.S. *Corporations* § 513.
>
>> A director or officer who usurps a corporate opportunity holds the usurped opportunity, and all the profits and benefits received therefrom, as constructive trustee for the corporation, or is liable in damages measured by the profits which the corporation lost by not getting the opportunity. It is immaterial that the corporation suffered no out-of-pocket loss or that the fiduciary was not unjustly enriched by the transaction.
>
> *Id.* The Court in *Aqua-Culture Technologies, Ltd. v. Holly*, 677 So. 2d 171, 183-184 (Miss. 1996), stated similarly that "recovery of profits may be awarded where one who breaches a fiduciary obligation makes profits in excess of the loss caused by the breach." (citing *Norte & Co. v. Huffines*, 288 F. Supp. 855, 864 (S.D.N.Y. 1968).
>
> In making a determination as to the time expiration of any damage award, the Court turns to the case of *Knox Glass Bottle Co. v. Underwood,* 89 So. 2d 799, (Miss. 1956), where the Court was faced with somewhat similar facts. In *Knox Glass*, Roy Underwood, the president of a corporation, died. After his death, his brother took over as president and the corporation entered into trucking leases for the transportation of products. The leases were entered into between the corporation and some of the Underwood family, who were shareholders. associates, and friends. Through the leases, these persons yielded large personal profits. *Knox Glass*, 89 So. 2d at 803-813. The corporation sued arguing unjust enrichment and violation of fiduciary duties. The Court ultimately held that the directors and officers of Knox Glass personally leased trucks and received substantial profits from the leases. Since the corporation had the funds to purchase trucks, which would have been much

25

less costly than the leasing of the trucks, the directors and officers were liable for profits realized by the leases for a reasonable time after the death of the president. *Id.* at 818 (Emphasis added). The Court has thereby set forth a subjective standard when making a determination of damages where a fiduciary has breached his or her duty to a corporation.

Whatever damages, if any, due and owing are to be paid to . . . Limestone Products, not the individual shareholders. In making a damages determination the Court must consider what, if any, profits were made by Lampkin as a result of the usurpation. This assessment or valuation requires the Court to look at the assets of Limestone Products, the income or profit of both Limestone Products and Delta Stone, and the debts and other expenses associated with the operation of both Limestone Products and Delta Stone.

¶55. I include this lengthy quote of the chancellor's opinion because I believe he has accurately stated the law that is applicable here. However, starting in the last sentence of this quote, the chancellor has committed error.

¶56. Further, in the next paragraph, the chancellor makes erroneous statements of law. The judgment states:

All of the discussion regarding the line of credit and Lampkin Construction's payment for purchase of rock really aren't of any importance to the Court since the line of credit was paid off in April 2007 and Lampkin Construction has paid all debts owing to Limestone Products. These payments will be reflected in the financial records of the businesses. Also, the Court is of the opinion that the experts are just splitting hairs with getting bogged down in an argument over the terminology used to describe the valuation of Limestone Products. Whether you call it asset based or net book value or lost profits, the Court is merely concerned with how and when to value this business. Both experts were accepted as experts in the field of business valuation and the Court will consider the reports and testimony of both Koerber and Saunders in making its finding.

¶57. The chancellor has the duty to weigh the evidence, assess the credibility of witnesses, and chose what evidence to rely upon. Notably, the chancellor states that "the Court is of the

26

opinion that the experts are just splitting hairs with getting bogged down in an argument over the terminology used to describe the valuation of Limestone Products." I disagree and find this to be reversible error. The experts were not "just splitting hairs" or "getting bogged down"; rather, they were testifying about detailed and important accounting terminology.

¶58. The chancellor "determined Lampkin breached his fiduciary duty to the Smith estate by usurping a corporate opportunity through the starting of Delta Stone." A lost-profits analysis should be used to calculate damages based on a claim of breach of fiduciary duty. *Griffith v. Griffith*, 997 So. 2d 218, 223 (¶19) (Miss. Ct. App. 2008). Likewise, a lost-profits analysis should be used to calculate damages based on a claim of usurpation of a corporate opportunity. *Aqua-Culture Technologies, Ltd. v. Holly*, 677 So. 2d 171, 184 (Miss. 1996).

¶59. There is simply no legal authority for the chancellor to consider a business-valuation analysis for a claim of breach of fiduciary duty or usurpation of corporate opportunity.

¶60. Further, it is illogical to include a calculation of "net book value" in a calculation for damages when the court found a breach of fiduciary duty or a usurpation of corporate opportunity. Upon dissolution, the shareholder of a corporation is entitled to receive a distribution of the corporation's assets that remain. "Net book value" is simply an accounting term that is not directly related to the actual value of the corporation's assets. It should not be considered as part of the calculation of damages for a recovery based on the claims of breach of fiduciary duty or a usurpation of corporate opportunity. There is simply no case to support this conclusion.

¶61. Also, I disagree with the chancellor's disregard of the unreported rock. Each side's

27

expert witness agreed that tons of rock were diverted by Lampkin from Limestone Products to either Delta Stone or Lampkin Construction. Saunders testified to the following in his direct testimony about Koerber's testimony of "unreported rock":

> Well in truth if unreported means they weren't reported in Limestone then yeah, that's right. But they were reported in Delta Stone. 154,000. He moved the tons from Limestone to Delta Stone. And I've already told you that he did that. There's no question that he did that.

Thus, Saunders's testimony supported Koerber's analysis, when Koerber testified:

> Limestone Products was also damaged by Mr. Lampkin purchasing rock delivered to the Limestone Products facility and circumventing the accounting system of Limestone Products. From 2003 through 2006, while Limestone Products was still operating, numerous invoices from Luhr Brothers and Tower Rock were not entered into the Quickbooks accounting system of Limestone Products, Inc. Limestone Products experienced lost profits due to the circumvention of the accounting system.

I am of the opinion that the chancellor was in error to not consider the unreported rock in the calculation of damages.

¶62. Accordingly, I would reverse and remand this case to the chancellor for a new trial on damages. As part of the remand, I would also remand the claim of attorney's fees. I note that in *Aqua-Culture*, the Mississippi Supreme Court upheld an award of attorney's fees against the "improperly-acting shareholder." *Covington v. Covington*, 780 So. 2d 665, 671 (¶14) (Miss. Ct. App. 2001) (citing *Aqua-Culture*, 677 So. 2d at 184).

**BARNES, ISHEE AND FAIR, JJ., JOIN THIS OPINION.**