# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2022-CA-00090-COA

**SINGING RIVER HEALTH SYSTEM**        **APPELLANT**

**v.**

**AMY BRAND, INDIVIDUALLY AND AS**        **APPELLEES**
**ADMINISTRATRIX OF THE ESTATE OF DEBBIE**
**EDWARDS, DECEASED, AND ON BEHALF OF**
**ALL WRONGFUL DEATH BENEFICIARIES OF**
**DEBBIE EDWARDS, DECEASED, AND APRIL**
**KATTAWAR**

| | |
|---|---|
| DATE OF JUDGMENT: | 01/03/2022 |
| TRIAL JUDGE: | HON. FORREST A. JOHNSON JR. |
| COURT FROM WHICH APPEALED: | JACKSON COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | BRETT K. WILLIAMS |
| | WILLIAM ROBERTS NORMAN |
| ATTORNEYS FOR APPELLEES: | BENJAMIN NOAH PHILLEY |
| | NELSON W. WAGAR III |
| | SARA WAGAR HICKMAN |
| NATURE OF THE CASE: | CIVIL - MEDICAL MALPRACTICE |
| DISPOSITION: | AFFIRMED - 07/18/2023 |
| MOTION FOR REHEARING FILED: | |

**BEFORE CARLTON, P.J., WESTBROOKS AND McCARTY, JJ.**

**McCARTY, J., FOR THE COURT:**

¶1. A patient died from a stomach bleed after she was treated at a hospital. Her family

sued the hospital, among others. After a bench trial, the circuit court found the facility

breached the standard of care it owed to the patient. Finding no error on appeal, we affirm.

## BACKGROUND

¶2. The facts of this case are not contested. Debbie Edwards was admitted to Singing

River Hospital in Ocean Springs on May 27, 2018. She was suffering from weakness and

passing bloody stool.

¶3. The next day, Debbie underwent a procedure called an esophagogastroduodenoscopy, or EGD, to diagnose and treat problems in her upper gastrointestinal tract. The source of Debbie's GI bleed was traced to a procedure she had years before called a fundoplication. A fundoplication can be used to curtail acid reflux by wrapping part of the stomach around itself and sewing it into place. This procedure had failed, resulting in what the physicians treating Debbie called a Mallory Weiss tear, a rip in her lower esophagus.

¶4. But the EGD didn't stop Debbie's bleeding. Over the next few days at the hospital, several more attempts were made to stop it; all told, she would undergo four EGDs during her ten-day stay at Singing River.

¶5. Dr. John McKee, a gastroenterologist, performed the first EGD on May 28, the day after Debbie arrived at Singing River. This procedure resulted in the diagnosis of the tear at the failed fundoplication site. A few days later, on June 1, Dr. McKee performed a second EGD. He described seeing what he thought was "dried up blood that resembled coffee grounds," meaning there was no active bleeding.

¶6. Unfortunately, the day after, a third EGD revealed the bleeding hadn't stopped. Dr. Srikrishna Patnana, another gastroenterologist, described a "spurting artery, in the failed fundoplication." The doctor clipped the GI tract at the failed fundoplication site with the hope it would stop the bleeding.

¶7. Although the third EGD appeared to be successful, Debbie was still considered "high

2

risk for bleeding." Indeed, the concern was so steep that Dr. Patnana believed she needed a different type of medical care: "should bleeding reoccur, interventional radiology (IR) would have to be consulted to embolize the spurting artery," while relying on the services of a radiologist. In other words, if the EGD approach to the GI bleed wasn't working, the hospital should try the IR treatment to stop the bleed.

¶8. Over the next few days, June 4 and 5, Debbie's health began to fluctuate. After June 4, Dr. Stuart Phillips viewed her condition as improved; he moved her out of intensive care. But around 12:30 a.m. on June 5, Debbie's bleeding resumed. She began to vomit and pass bloody stool. Her daughter Amy Brand had driven to visit her in the hospital and attempted to comfort her. Brand later described the horror of seeing her mother in such a weakened state. Brand took photographs that showed her mother lying in a puddle of blood spread over the bed.

¶9. The nurses on duty flagged the nocturnist, Dr. Jatinder Singh, at 1:12 a.m. At some point, a blood transfusion was ordered but was not initiated until 4:00 a.m. At 5:15 a.m., Dr. Singh was told that Debbie had a low blood-pressure reading, and saline was ordered. Dr. Singh rotated off duty, and Dr. Stuart Phillips came on duty as the hospitalist.

¶10. At 7:00 a.m., not long after clocking in, Dr. Phillips found that Debbie was unstable. As a result, at 7:41 a.m. the doctor ordered an IR embolization.

¶11. But there was a problem. At 8:20 a.m., the hospital staff realized Singing River's radiologist was on vacation. No one at Singing River could perform the critical operation

3

to stop Debbie's GI bleed.

¶12.  With the patient now bleeding extensively, she was transferred back to ICU.  A general surgical consultation was ordered to address the GI bleed.  Nearly fifteen minutes later, at 8:41 a.m., the consultation was canceled.  Instead, it was decided a fourth EGD should be performed.  At 9:00 a.m., Dr. Phillips decided Debbie needed to be transferred to a facility with IR capability to treat the ongoing bleed in her GI tract.

¶13.  Dr. Phillips decided on Ochsner Medical Center, which was relatively nearby in New Orleans.  By early afternoon, at 1:05 p.m., Ochsner agreed to admit Debbie but didn't yet have a bed for her.  At 4:46 p.m., Dr. McKee performed the fourth and final EGD on Debbie.  But during the procedure, the GI bleed became more and more prominent—and then Debbie's heart stopped.  Singing River revived her and abandoned the procedure shortly after 5:00 p.m.

¶14.  Even though efforts had been made hours before to transfer her to Ochsner, an ambulance was not called until 6:20 p.m., nearly five hours later.  It arrived at 7:08 p.m. and departed Singing River at 8:16 p.m.  With her daughter following behind, Debbie arrived in New Orleans at 9:51 p.m.  But after days of bleeding, she slipped into cardiac arrest and died.

**PROCEDURAL HISTORY**

¶15.  Debbie's daughters filed a lawsuit in their individual capacities, and Brand also acted on behalf of their mother's Estate and wrongful death beneficiaries.  The hospital did not file a motion to dismiss or for summary judgment, and the case proceeded to a bench trial.  Over

4

the three-day trial, Debbie's Estate called six witnesses: both her daughters, treating physicians Dr. Stuart Phillips and Dr. Jatinder Singh, and retained experts Dr. Stephen W. Landreneau and Dr. Kyle Happel.

¶16. Brand was called to testify first and described her mother, who passed away at age 65, as a very outgoing and family-oriented person. Brand testified that on June 5, when she got to the hospital, her mother was "very nauseous and . . . kept asking for Phenergan because that's what helped her with the nause[a]." Brand further testified that she witnessed her mother vomit blood, and Debbie was so afraid that she repeatedly pleaded for someone to help her.

¶17. Debbie's youngest daughter, April Kattawar, testified next. Kattawar testified that she arrived at Ochsner around 10:30 p.m. on June 5. Upon her arrival, her mother was "coding." She testified that once inside, she was met by a doctor who informed her and her sister that their mother was really sick and that her organs were shutting down; there really wasn't much that could be done to save her.

¶18. Then Dr. Singh testified, stating he had been on duty on June 4, the night before Debbie died. He recounted how he was notified that in the middle of the night Debbie had begun throwing up blood, passed a bloody stool, and experienced a drop in hemoglobin, which had all been documented in the nurses' notes:

> Patient stated that she had started throwing up blood onto the floor. About 10 cc was caught in emesis bag after throwing up on the floor. Emesis was red in color . . . . Patient had very large bloody bowel movement during emesis spell. Cleaned and new brief applied.

5

¶19.   Dr. Singh testified he gave Debbie "packed" red blood cells because he believed she was bleeding again.  However, Dr. Singh did not consult anyone in the radiology department at this point because he believed she was stable, and "there was no reason to escalate care at that point."

¶20.   In marked contrast,  Dr. Phillips testified that at the beginning of his shift on June 5, he found that Debbie was terribly unstable.  So he ordered the IR embolization at 7:41 a.m., and he agreed when asked if it was obvious to him that Debbie was acutely bleeding and unstable.  He testified that "during the seven hours . . . between then and when [he] took over her care, no medical intervention had been undertaken to stop the bleeding[.]"  Moreover, "[t]here was no call to the GI service, Dr. McKee, Dr. Patnana, or anybody else to see about an endoscopy to stop the bleeding."  He further testified that the request for the procedure was canceled at 8:20 a.m. because the radiologist would not be available until the following week. Dr.  Phillips stated it was at this time that he decided to have the fourth EGD performed.  He requested a surgery consultation and for Debbie to be transferred back to ICU.

¶21.   He further testified that after the consultation, the general surgeon determined Debbie was not a candidate for surgery.  At 9:00 a.m., Dr. Phillips decided Debbie needed to be transferred to another facility with IR capabilities.  He also testified that an operating room was requested at 9:49 a.m. to perform Debbie's fourth EGD, though it was not performed until 3:35 p.m.  When asked if he agreed with the Estate's lawyer that "eleven hours is a

6

pretty long time for someone who's bleeding and hemorrhaging to be transferred," Dr. Phillips agreed.

¶22.   The trial court also heard from both of the Estate's retained experts.  The first was Dr. Stephen Landreneau, an associate professor of clinical medicine at the Louisiana State University Health Science Center.  Dr. Landreneau is board-certified in gastroenterology and internal medicine.  Dr. Landreneau teaches and supervises endoscopy in his capacity as a professor.  He explained to the court that "GI bleeding is a major part of [his] practice and [he] care[s] for these patients almost daily in the hospital."  Dr. Landreneau was tendered and accepted, without objection, as an expert in the field of gastroenterology and internal medicine.

¶23.   To Dr. Landreneau, it wasn't the care Debbie actually received that harmed her but, rather, the care she *hadn't* received.  According to Dr. Landreneau's expert report, "the inpatient care provided by the gastroenterology service met the standard of care in managing [Debbie's] upper gastrointestinal bleed[.]"  In contrast, "the delay in involving interventional radiology following the bleeding episode . . . on [June 5], the lack of interventional radiology availability, and the lack of consultation with the surgery service are below that standard of care."  The physician concluded that "in the absence of these factors, more likely than not, [Debbie] would have survived."

¶24.   Debbie's Estate also offered the expert testimony of Dr. Kyle Happel, a professor of medicine at the Louisiana State University Health Science Center.  Dr. Happel is board-

7

certified in pulmonary diseases and critical care medicine. He testified that in his capacity as a professor, he takes care of patients in ICU, performs inpatient consultations, and provides care for outpatients with pulmonary disease. Dr. Happel further testified that as a critical care physician, he is familiar with the standard of care applicable to Debbie. Dr. Happel was tendered and accepted as an expert in critical care and pulmonology.

¶25. In Dr. Happel's expert report, he stated that "the pivotal moment in her hospitalization came on the early morning of [June 5]." "At that point, it was known that [Debbie] had a bleeding artery in her stomach." First, Dr. Happel opined, "If [Debbie] had been taken to the operating room [on June 5], she more likely than not would have survived." Then the doctor opined, "If [Debbie] had been more quickly transferred on June 5th to a facility that could have performed surgery or embolization of the bleeding vessel, she more likely than not would have survived."

¶26. Singing River called only one witness in its defense: Dr. Bruce Brown, its retained expert. Dr. Brown was both a board-certified internal medicine physician, an FAA commercial pilot, and a certified flight instructor.[1]

¶27. Dr. Brown further testified it was not unusual to have a six-, ten-, or even twelve-hour

---

[1] Debbie's Estate included a claim against Singing River that it breached the standard of care by driving her to Ochsner via ambulance instead of the quicker route of flying her. Dr. Brown's expert testimony persuaded the trial court that the weather conditions made flying too dangerous, and the trial court concluded the hospital had not breached the standard of care in this fashion. Because there was no cross-appeal on this point, we do not delve into it further.

delay in transferring a patient to another facility. Moreover, he believed Singing River "appear[ed] to be making every attempt to have Debbie transferred in an expeditious fashion." Essentially, he testified that "no one at Singing River Hospital failed to comply with the standard of care" owed to Debbie.

¶28. Less than two weeks after the trial concluded, the trial court issued findings of fact and conclusions of law. The court found Brand's experts "Dr. Stephen Landreneau and Dr. Kyle Happel to be extremely well-credentialed, and their testimony to be very persuasive, particularly on the issue of whether or not the applicable standard of care was met or not." The court also found Singing River's expert, "Dr. Brown, to be well-credentialed and knowledgeable" on whether air transport could have been used to transport Debbie. Critically, the court further found Dr. Brown's testimony was "credible and persuasive" in agreeing that "IR is generally effective more often than not to stop a bleed."

¶29. However, the court did not find "Dr. Brown's opinion that Singing River met the applicable standard of care to be persuasive." The court further found that "[Singing River] and its employees knew on the morning of [Debbie's] re-bleed, by about 9:00 a.m., that the reasonable and prudent plan for her medical care could not be implemented, due to their IR not being available." The court found "a general lack of urgency" from that point on by Singing River in getting Debbie transferred for her "final chance of survival." While acknowledging the testimony that it could take a while to effectuate a transfer, the court held, "[T]hat may be so for a patient who is not bleeding out, but it should not be blindly accepted

9

in a time-critical emergency situation that existed here."

¶30. The court ultimately held that Singing River's treatment of Debbie "fell below and breached the applicable standard of care and resulted in medical negligence, and proximately caused her death." As a result, the court found Brand incurred economic damages in the amount of $6,213.54 as well as non-economic damages of $375,000; it entered judgment against Singing River for that amount, with 8% interest, the same day.

¶31. The hospital did not file a motion to alter or amend the judgment or a motion to reconsider and instead filed a notice of appeal. The Supreme Court assigned the case to us for review.

## DISCUSSION

¶32. On appeal, Singing River argues that the trial court committed manifest error in concluding the hospital was vicariously liable. Singing River further argues that neither Debbie's Estate nor the trial court identified an articulable or objective standard of care that was breached. Next, Singing River argues that the trial court abused its discretion in allowing and relying on Debbie's experts' testimony regarding causation. Last, the hospital argued that the trial court's decision was manifestly wrong and clearly erroneous and that the trial court applied an erroneous legal standard.

### I. The vicarious liability issue is procedurally barred.

¶33. For its first issue on appeal, Singing River asserts the trial court "inappropriately found [the hospital was] vicariously liable despite its finding that Singing River's employees

10

were not negligent." Essentially, the hospital asks to be relieved of liability because it claims the trial court found two of its doctors met the standard of care.

¶34.   This argument fails for two reasons. First, as the hospital sets out in its brief, the trial court's oral pronouncement suggested that neither Dr. Singh nor Dr. Phillips breached the standard of care, but this alleged determination did not reach the final written order in this case. At oral argument, counsel for the hospital heavily emphasized what the trial judge *said* after trial, but this purported determination was not contained in its written order. To the extent Singing River predicates error on this oral pronouncement, "Mississippi's longstanding rule is that a court's written decision trumps its oral one." *Hill v. Hinds County*, 237 So. 3d 838, 844 (¶21) (Miss. Ct App. 2017).[2]

¶35.   This argument also was never raised before the trial court in any fashion; it is wholly new to the case now on appeal. As set out above, before trial, Singing River never filed a motion to dismiss or for summary judgment or a motion to exclude the plaintiffs' experts; after trial, Singing River never filed a motion to alter or amend the judgment or reconsider any other ruling of the trial court. "[U]nder Mississippi law, an appellant is not entitled to raise a new issue on appeal, since to do so prevents the trial court from having an opportunity

---

[2] The written order expressly held the hospital and its employees breached the standard of care, finding "that the defendant and its employees knew on the morning of Debbie's re-bleed, by about 9:00 a.m. that the reasonable and prudent plan for her medical care could not be implemented, due to their IR not being available." And as addressed more fully below, it was not the specific actions of the two physicians the trial court found breached the standard of care, but rather the general *inaction* of transferring Debbie to a facility that could treat her GI bleed.

11

to address the alleged error." *Crowe v. Smith*, 603 So. 2d 301, 305 (Miss. 1992).

¶36. Our courts have long held that "as a prerequisite to obtaining review in this Court, it is incumbent upon a litigant that he not only plead but press his point in the trial court." *E.g.*, *Allgood v. Allgood*, 473 So. 2d 416, 423 (Miss. 1985). "A trial judge cannot be put in error on a matter which was never presented to [the judge] for decision." *Cooper v. Lawson*, 264 So. 2d 890, 891 (Miss. 1972).

¶37. In her response brief, citing the above standard, Brand argues that we cannot reach this issue because it was never presented to the trial court for review. In its reply, Singing River did not address the procedural bar, and during oral argument, the hospital failed to present authority as to how this claim could be presented for the first time on appeal. Accordingly, we find this argument barred.

## II. The experts were qualified to testify.

¶38. While somewhat conflated, Singing River raises two arguments regarding the expert testimony offered by the plaintiffs. As a threshold argument, the hospital argues the experts were not qualified to testify to the standard of care and whether it was breached. Second, Singing River argues that the plaintiffs failed to prove a "loss of chance of recovery" as required by our precedent.

¶39. "When proving [the] elements in a medical malpractice suit, expert testimony must be used." *Griffin v. N. Miss. Med. Ctr.*, 66 So. 3d 670, 673 (¶7) (Miss. Ct. App. 2011). In Mississippi, "expert testimony should only be admitted if it withstands the two-prong

12

inquiry." *McDonald v. Mem'l Hosp. at Gulfport*, 8 So. 3d 175, 181 (¶15) (Miss. 2009). "First, the witness must be qualified by virtue of his or her knowledge, skill, experience or education." *Id*. "Second, the witness's scientific, technical or other specialized knowledge must assist the trier of fact in understanding or deciding a fact in issue." *Id*. "However, it is not required that an expert in a medical-malpractice case be of the same specialty as the doctor about whom the expert is testifying." *Id*. "It is the scope of the witness' knowledge and not the artificial classification by title that should govern the threshold question of admissibility." *Id*. "However, the expert must still show satisfactory familiarity with the specialty of the defendant doctor in order to testify as to the standard of care owed to the patient." *Id*.

¶40.    This case does not center on the claim that particular actions of Singing River harmed Debbie, but rather that the breach was the facility's delay in providing her care.  The same precedent applies since "[a]n expert is necessary to identify the action *or inaction* which allegedly constituted a breach of duty and which proximately caused the patient's injury." *Giuffria v. Concannon*, 851 So. 2d 436, 439 (¶16) (Miss. Ct. App. 2003) (emphasis added); *see also Est. of Sykes ex rel. Campbell v. Calhoun Health Servs.*, 66 So. 3d 129, 133-34 (¶19) (Miss. 2011) ("The breach of applicable standards of care in a medical-malpractice case generally must be established by expert testimony that identifies the action or inaction that allegedly constituted a breach of duty and that proximately caused the patient's injury.").

> **A.    The experts were qualified to testify as to the proximate cause of Debbie's death.**

13

¶41. Our Supreme Court has examined what type of doctor is needed to establish causation. *McDonald*, 8 So. 3d at 181 (¶15). In that case, a patient had been admitted to a hospital for pneumonia. *Id*. at 177 (¶2). Once there, the patient "experienced nausea and vomiting of brown material or blood," after which a doctor was called; during a procedure to stop the bleeding, the patient died. *Id*.

¶42. At trial, the widow of the patient attempted to offer testimony from experts regarding the standard of care applicable to a gastroenterologist. *Id*. at 181 (¶16). However, one of the experts, a board-certified pathologist and psychiatrist, "ha[d] never practiced in the field of gastroenterology, and since medical school [the doctor] ha[d] not performed any procedures in this field other than one colonoscopy in 1976." *Id*. The trial court struck the expert as unqualified and granted summary judgment. *Id*. at (¶18).

¶43. The Supreme Court reasoned that "[i]n order to testify, [the expert], while not required to be a gastroenterologist, had to at least be familiar with the standard of care to which a gastroenterologist is held." *Id*. at 181 (¶17). Since the expert wasn't, the Court affirmed, holding that "expert testimony must be used in proving the elements of medical negligence[,] . . . and absent such testimony there is no triable issue of fact with regard to the alleged medical negligence." *Id*.

¶44. A similar result was reached in *Griffin*, *supra* ¶39, the case primarily relied upon by the hospital in this appeal. The patient in that case needed dialysis, which required the use of an abdominal peritoneal dialysis catheter. *Griffin*, 66 So. 3d at 672 (¶2). The abdominal

14

site became infected, and doctors determined it was necessary to switch to a different catheter. *Id*. During the operation, the patient's carotid artery was punctured, and a doctor attempted to repair it with stitches. *Id*.

¶45.    While in the recovery room, the patient started to exhibit symptoms "consistent with internal bleeding from an ineffectively repaired carotid artery." *Id*. Although some treatments were administered, "[they] were only temporarily effective, and the patient's condition continued to deteriorate." *Id*. About three hours later, the doctor determined that it was necessary to reopen the surgical site. *Id*. at (¶3). Before that could be done, the patient went into cardiac arrest, suffered extensive brain damage, and died. *Id*. The patient's daughter filed a wrongful-death suit against the hospital. *Id*. at (¶44).

¶46.    At trial, the daughter argued the nurse was negligent in her failure to warn a doctor of the patient's blood loss, which caused a fatal delay. *Id*. at (¶6). The daughter offered the expert testimony of a doctor who was an expert in both emergency and family medicine. *Id*. at 673 (¶12). The doctor claimed no expertise in surgery and was not accepted as an expert in that field. *Id*.

¶47.    At the close of the daughter's case-in-chief, the trial court granted the hospital's motion for a directed verdict, finding that the daughter "failed to present sufficient evidence on the issue of proximate cause." *Id*. at 672-73 (¶6).

¶48.    We affirmed, since the doctor "could not testify as to what a surgeon would have done, nor could he testify that timely surgical intervention would have, more likely than not,

15

saved [the patient's] life." *Id*. at 674 (¶13). And lacking this testimony, the trial court had been correct to conclude the daughter could not support an essential element of a prima facie case for "lost-chance-of-recovery." *Id*.

¶49. This appeal presents a different scenario from this key precedent. In *McDonald* and *Griffin*, the experts were deemed unqualified because they did not have the requisite experience to testify in that realm of medical knowledge. In *McDonald*, the patient experienced nausea and vomiting and was ordered to have an EGD. *McDonald*, 8 So. 3d at 177 (¶3). The widow offered an expert certified in pathology and psychiatry instead of expert testimony from a gastroenterologist. *Id*. at 181 (¶16). Since the expert was not "familiar with the proper standard of care," he was disqualified. *Id*. Similarly, in *Griffin*, the patient had suffered a punctured artery during surgery, so the party needed to bring in expert testimony on the standard of care for a surgeon. *Griffin*, 66 So. 3d at 672 (¶10). Instead, the daughter offered an expert certified in emergency and family medicine. *Id*. Consequently, the expert did not have the knowledge, skill, or experience required to establish the applicable standard of care or a breach of a surgeon. *Id*.

¶50. In contrast, in this case both sides agree Debbie suffered from a GI bleed at the site of the failed fundoplication. It rationally follows any proffered expert needed to be familiar with the standard of care for how a doctor would treat a patient with that kind of GI bleed. Both experts retained by the Estate testified they were familiar with the applicable standard of care, and both testified that treating patients with GI bleeds was part of their day-to-day

16

practice as physicians. Indeed, Dr. Landreneau was board-certified as a GI specialist; the other, Dr. Happel, specialized in critical care. We find these experts met the standards articulated by precedent.

¶51. Nonetheless, Singing River argues that the experts were not qualified to testify to the applicable standard of care owed to Debbie. The hospital's core argument is that because the experts were not radiologists, they were not qualified to testify as to causation. It is undisputed Debbie suffered from a bleed in her GI tract. The evidence before the trial court was that a bleed of this type could be treated in various ways, including by conventional surgery (as with the EGD procedure) or the IR procedure as performed by a radiologist. Still, the focus remains the same—the treatment of a GI bleed.

¶52. The Estate was not required to bring "an expert in a medical-malpractice case . . . of the same specialty as the doctor about whom the expert is testifying." *McDonald*, 8 So. 3d at 181 (¶15). For "[i]t is the scope of the witness' knowledge and not the artificial classification by title that should govern the threshold question of admissibility." *Id.* The experts were physicians who were qualified by their skill, knowledge, and experience of treating patients with GI bleeds and, therefore, properly allowed to testify as to the proximate cause of the patient's death.[3]

---

[3] Nor does it matter that the particular location of Debbie's bleed was unusual. Her own experts agreed they had not seen a Mallory Weiss tear at the site of a failed fundoplication. The point remains that it was still a GI bleed, and therefore a GI doctor could testify to the applicable standard of care owed in such a situation. Even though the bleed was at a novel site, all three experts agreed it could be treated with an EGD or through

17

**B.** **The Estate provided evidence that Debbie more likely than not would have survived but for the negligence of Singing River.**

¶53.  Singing River also argues the Estate failed to show that proper treatment would have provided her with greater than a fifty-percent chance of a better result than was in fact obtained, termed the "lost chance of recovery" theory.

¶54.  When establishing proximate causation in a case about a lost chance of recovery, "the plaintiff must prove that had proper care been administered then it is probable, or more likely than not, that a substantially better outcome would have resulted." *Griffin*, 66 So. 3d at 673 (¶9).  This is principally required "where the allegation is that a medical provider failed to administer proper care and that the failure allowed an already existing injury to deteriorate." *Id*.  Simply put, "to establish her prima facie case, the daughter had to offer expert testimony to establish that had the nurse timely recognized the blood loss and timely warned a surgeon, the surgeon would have intervened, and that intervention would have, more likely than not, saved [the patient's] life." *Id*. at (¶10).

¶55.  Evidence from the experts showed whether Debbie would more likely than not have survived if she had received IR treatment.  Dr. Landreneau stated in his expert report that "the delay in involving interventional radiology following the bleeding episode[,] . . . the lack of interventional radiology availability, and [the]lack of consultation with the surgery service are below the standard of care."  As a result, the expert concluded, "[I]n the absence of these

the IR procedure.

18

factors, more likely than not, [Debbie] would have survived." And while on the stand, Dr. Landreneau agreed when asked if those factors "more likely than not caused or contributed to [Debbie's] demise."

¶56. Similarly, Dr. Happel stated in his expert report that Debbie "more likely than not would have survived" "if she had been taken to the operating room on the day of her recurrent bleeding" and "had been more quickly transferred . . . to a facility that could have performed surgery or embolization of the bleeding vessel[.]"

¶57. As a result, we find that the requirements of precedent for experts were met in this case.

### III.    There was substantial evidence to support the trial court's findings.

¶58. For its last assignment of error, Singing River argues the trial court's decision is manifestly wrong, clearly erroneous, and the result of applying an erroneous legal standard.

¶59. "The standard by which an appellate court reviews factual determinations made by a trial judge sitting without a jury is the substantial-evidence standard." *Norris v. Sw. Miss. Reg'l Med. Ctr.*, 105 So. 3d 410, 414 (¶14) (Miss. Ct. App. 2012). "Under this standard, a trial judge's findings will not be reversed on appeal where they are supported by substantial, credible, and reasonable evidence." *Id*.

¶60. Here, the trial judge heard testimony that revealed Debbie bled for eleven hours after it was determined that she was suffering from a re-bleed in her GI tract. Further, testimony from her treating physicians revealed that her treatment plan advised that if she began to

19

bleed again she would either need another EGD to pause the bleed or an IR procedure to stop the bleed completely. The court heard testimony from Dr. Phillips who stated that they in fact did perform a fourth EGD but abandoned it since Debbie went into cardiac arrest during the procedure. At that point, the only option left was the IR procedure, which could not be performed at Singing River. But the transfer to a hospital that could provide those services came with an eleven-hour delay. Notably, these facts were not in dispute.

¶61. Both sides presented conflicting expert testimony to the trial court as to whether the standard of care was breached. "It is well-settled law that when conflicting expert testimony is presented, the winner in a battle of the experts is to be decided by a jury" or, in a bench trial, by the judge as the trier of fact. *Fonville v. Zeid*, 327 So. 3d 658, 670 (¶36) (Miss. Ct. App. 2021). The trial court was persuaded in part by the experts retained by the plaintiffs, specifically as to the standard of care and its breach, and in part was persuaded by the hospital's expert as to whether it breached the standard by transporting her by ambulance to Ocshner rather than travel by air. These were issues best resolved by the trial judge, whose findings were supported by substantial evidence.

¶62. Last, Singing River attacks the trial court's usage of the phrase "totality of the circumstances" in its order. While the trial court used the phrase in finding Singing River had breached the standard of care, this does not require reversal. For even assuming the learned trial judge deployed the wrong standard of review, "[a]n appellate court may affirm a trial court on other grounds if it finds that the trial court reached the right result despite its

flawed or erroneous premises." *Harbit v. Harbit*, 3 So. 3d 156, 163 (¶24) (Miss. Ct. App. 2009). As set out above, a thorough review of the trial court's findings of fact and conclusions of law establishes the standard of care was correctly assessed and deeply considered by the trial court.

¶63. Given the unique set of undisputed facts in this case and the competent expert testimony, we find no merit to this argument.

## CONCLUSION

¶64. We find the errors claimed by the hospital do not meet the standard for reversal. The trial court had before it a set of undisputed facts that Debbie Edwards spent multiple hours bleeding while in the care of Singing River, including hours after the facility knew it did not have the resources to treat her. Competent expert testimony established this was a breach of the applicable standard of care and caused the damages awarded. Accordingly, we find that the judgment of the trial court should be affirmed in all respects.

¶65. **AFFIRMED.**

**BARNES, C.J., CARLTON, P.J., GREENLEE, WESTBROOKS, McDONALD, SMITH AND EMFINGER, JJ., CONCUR. WILSON, P.J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION. LAWRENCE, J., NOT PARTICIPATING.**